

**SIGNED this 09th day of April, 2012.**

_____
LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE
_____

# United States Bankruptcy Court
Western District of Texas
San Antonio Division

| | |
|---|---|
| In re | Bankr. Case No. |
| Premium Well Drilling, Inc. | 10-54062-C |
| *Debtor* | Chapter 11 |

### Memorandum Decision on Application of Insurers for Payment of Administrative Expense Claim

Came on for hearing the foregoing matter. After hearing, the court took the matter under submission. The movants are a group of insurance companies[1] affiliated with Chartis, Inc. (hereinafter the "Insurers"). They filed a request, seeking payment of an alleged administrative expense for insurance coverage post-petition, in the amount of $184,515.00. The Reorganized Debtor objected, contending that the value of coverage post-petition was much lower (because the debtor had fewer employees and operations

---

[1] Commerce and Industry Insurance Company, Illinois National Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and "certain other affiliates of Chartis, Inc." *Request and Application of Insurers for Payment of Administrative Expense Claim* [Doc. #347].

in that period). They say that the claim could at best be no more than $59,472.00. The matter was presented to the court primarily through stipulated facts and legal argument, though one witness (a representative of the insurance companies) also testified for the claimant. The witness was recalled to the stand later as the court's witness, to clarify a few matters.

The Insurers essentially argued that the claim was established by the terms of the contract (including the manner in which payment was computed under the contract). The Reorganized Debtor argued that the Insurers failed to sustain their burden because they had relied on an incorrect legal standard for what evidence would be needed to establish their claim. The essential difference between the positions is simple. The Insurers say that their claim is computed simply by determining the percentage of the year in which the policies were in force that was post-petition. The Reorganized Debtor contends that the computation must be more nuanced, because the premium is computed based on number of employees and what types of work they are doing, with some types being considered riskier than others. The Reorganized Debtor argues that the Insurers failed to distinguish between the risk profile pre-petition and the risk profile post-petition, and that as a result, they failed to prove that the amount they seek matches the benefit the estate received.[2]

---

[2] The Reorganized Debtor did not put on evidence to demonstrate that there was such a difference, other than to allude to the Monthly Operating Reports which showed that the debtor substantially curtailed its drilling activities after filing. The Reorganized Debtor argues, however, that the burden was on the claimant to establish its claim, and if it failed to put on the right *kind* of evidence to establish its claim in accordance with what the law requires, then the claim should fail for lack of evidence.

**Facts**

The parties entered into certain factual stipulations, relevant portions of which are set out here:

The pre-petition debtor contracted with C&I for workers' compensation insurance, with National Union for vehicle insurance, and with National Union for general liability insurance. The policies were for a one year period running from February 15, 2010 to February 15, 2011.

The bankruptcy case was filed October 20, 2010.

The policies remained in effect post-petition until their termination date, a period of 117 days. The policies were neither assumed nor rejected by the debtor.

The pricing of each policy was the same: an estimated price was charged at the beginning of the term, with the actual price for the term to be determined at the end of the term, following an audit of the debtor's records.[3] If the audit reflected that the estimate was higher than the actual premium for the year, the debtor would receive a refund. If the audit showed the estimate was lower than the actual premium for the year, then the debtor would be charged for the difference. This pricing scheme was a contract term for each policy.

The total estimated premium for all the policies was $398,679, which amount was paid by the debtor pre-petition.

---

[3] The workers' compensation policy provided that "[t]he premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy."  The general liability policy stated that the policy was "subject to an annual audit." The vehicle policy provided that "[t]he estimated premium for this coverage form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any." *Agreed Factual Stipulations* [Doc #424].

An audit was conducted according to the terms of the policies. The audit was conducted post-petition, with the debtor's consent and participation.

The Insurers determined, at the conclusion of the audit, that a total additional premium of $184,515.01 was due, per the terms of the contracts. The debtor did not (and does not) dispute the results of calculations of the audit. The calculations yielded a total premium on the three policies of $583,153.

The parties agreed that the insurance services furnished pursuant to these contracts provided a benefit to the estate.

The witness testified that the primary contributor to the differential was an increase in the number of employees doing well servicing work during the period of the policy. She was not asked regarding when, within the policy period, this increase occurred, or whether there was a later decrease.

In the audit process, the Insurers determine how many additional employees were added in each category within the period from February 15, 2010 to February 15, 2011. The salary paid per additional employee is multiplied by the number of days within the period that that employee was employed by the debtor. This yields an overall increase in payroll within each category. A formula is then applied to that increase to yield the amount of additional premium owed.[4] The effect is to spread the additional risk over the entire term of the policy, but at an amount reflecting only the additional months that the additional employees were employed.

---

[4] For example, suppose the payroll for service workers were $500,000 annually for 10 employees. Suppose then that 5 additional employees were added April 1, 2010, and they were let go September 30, 2010. This number of employees would be multiplied by the monthly salary they received, and further multiplied by the number of months they were employed. The total (in this case, $125,000) would then be added to the original $500,000, resulting in a new payroll for the year of $625,000. The premium formula would then be applied to the new payroll number, yielding a new premium. The difference between the two premiums would be the amount due from the insured at the end of the insurance term.

According to the witness, the audit contains sufficient information to determine during which months the employees were employed, but that information was not put into evidence.

The method of calculating the premium is designed to roughly approximate the level of risk assumed by the Insurers as a result of the number of employees working in various capacities during the contracts' term. The price of the policies are computed in terms of that risk assumption, and the methodology for incorporating that adjustment to arrive at the proper policy is determined at the time the policy is issued.

The Insurers are liable for all employees during the term, even though the employee is added after the policy begins and even though the Insurer has not yet been paid the full amount of the premium.[5] However, the Insurers are not liable for employees if an insurable event happens to (or is caused by) such a person when that person is not an employee.

The method employed by the Insurers for calculating premiums is an accepted method in the industry.

The Confirmation Order in this case set a deadline by when claimants were to file their claims for administrative expenses. The Insurers met that deadline here.

---

[5] In other words, part of the premium is paid up front, while the balance is paid at the end of the term. The Insurers are obligated to fully perform, even though they have not necessarily received their entire premium. Thus, the balance due (if any) is essentially an extension of credit to the debtor. And this means that the entire premium represents a *pre-petition* obligation, arising as it does under the terms of the contract entered into pre-petition. In substance, it is no different from a vendor who ships a product ordered by a debtor, with part of the price paid up front, and the balance due later. Few would dispute that the entire amount due to that vendor is a pre-petition claim, even though the due date for the balance might not occur until after the petition date. *See Mayer Pollock Stell Corp.*, 157 B.R. 952, 963 (Bankr. E.D.Pa. 1993); *see also In re Lockwood Enterprises, Inc.*, 54 B.R. 829, 831 (Bankr. S.D.N.Y. 1985) ("there is no statutory authority which allows creditors to convert their pre-petition claims to post-petition administrative expenses").

**Analysis**

Section 503(b)(1) authorizes allowance of administrative expenses of the estate, including "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). An expense so qualifies if the applicant's efforts resulted in a post-petition actual and demonstrable benefit to the estate. *In re Phones for All, Inc.*, 288 F.3d 730, 732 (5th Cir. 2002); *accord In re American Plumbing & Mechanical, Inc.*, 323 B.R. 442, 459 (Bankr. W.D.Tex. 2005). Benefit is measured from the point of view of the estate, rather than from the point of view of the applicant. *Matter of Strause*, 40 B.R. 110, 113 (Bankr. W.D.Wis. 1984) ("... the principal purpose of according administrative priority to claims for benefit to the estate is to prevent unjust enrichment of the debtor's estate, rather than simply to compensate the creditor"). What is more, the priority that is accorded such expenses is narrowly construed "because the presumption in bankruptcy cases is that the debtor's limited resources be equally distributed among ... creditors." *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988).

*Collier* explains that "most courts apply a two part test to determine whether a claim is entitled to administrative expense priority under section 503(b)(1)(A). First, it must arise from a transaction with the bankruptcy estate, and second, it must have directly and substantially benefitted the estate." ALLEN RESNICK & HENRY SOMMER, 4 COLLIER ON BANKRUPTCY, SIXTEENTH EDITION ¶ 503.06[3] (LexisNexis 2010).

In this case, the Insurers entered into a contract pre-petition, committing to insure for the entire term, but at a price ultimately determined at the end of the term. The entire claim came into existence at the time the contract was made; all that remained was computation of the balance at the end of the term. In other words, the *entire premium*

constitutes a pre-petition claim.⁶ Thus, the Insurers in effect extended credit to the debtor with regard to any additional premium that might be due as a result of changes in the debtor's risk profile occurring during the term of the policies. The fact that part of the premium is calculated at the end of the term does not convert that part of the claim into an administrative expense claim. *See In re Lockwood Enterprises, Inc.*, 54 B.R. 829, 831 (Bankr. S.D.N.Y. 1985). Nor does the fact that part of the performance might occur post-petition. *See In re Jartran*, 732 F.2d 584, 588 (7th Cir. 1984) (debtor committed to pay for advertising that was not published until post-petition; court ruled the claim was not an administrative expense "because the liability for the costs of the ads was irrevocably incurred before the petition was filed"); *see also* ALLEN RESNICK & HENRY SOMMER, 4 COLLIER ON BANKRUPTCY, SIXTEENTH EDITION ¶ 503.06[3][a](LexisNexis 2010) ("it is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor pre-petition").

     Nonetheless, the debtor's estate enjoyed the benefit of insurance coverage post-petition, and would be unjustly enriched were it (that is, the estate) not obligated to pay for the benefit it received. *See Matter of Strause*, 40 B.R. 110, 113 (Bankr. W.D.Wis. 1984). In many ways, the situation is analogous to that presented by leases, where the lessee pays a set amount for the right to occupy premises for a set period, then the lessee files for bankruptcy during that period. Prior to the changes to section 365 made by the 1984 amendments, post-petition obligations with respect to the estate's use of leased premises were handled no differently than other administrative expense claims. That is, the estate was obligated to pay for the benefit conferred, but was not obligated

---

⁶ The witness's testimony on this point was especially helpful -- the insurer is committed to insure for the any event that occurs within the term of the policy, even if the balance of the premium remains unpaid.

to pay if no benefit were incurred. Further, the estate was only obligated to pay the fair rental value of the premises, a number that *might* be different from the amount specified in the lease. In addition, the fair rental for the same premises might be lower depending on the use of those premises by the estate. In *Strause*, for example, a farmer leased land for planting. For a portion of the lease term (a portion occurring during the pendency of the bankruptcy), the land stood essentially fallow (because it was winter in Wisconsin). The court adjusted the payment due landlord to adjust for the actual use and occupancy of the land -- with a much lower payment being allowed for a period when the only benefit the estate realized from the land was storage. *Id.*

It is argued in this case that the Insurers failed to present evidence consistent with the foregoing test. That is, the Insurers presumed that the contract price, prorated for the post-petition period, represented the value of their administrative expense claim. The Reorganized Debtor suggests that the actual audit data, if presented, would demonstrate that the actual insurance benefit during the post-petition period was lower than during the pre-petition period, because the debtor's service business was severely curtailed and employees were laid off.[7] That sort of evidence, it was argued, is the sort that the law requires in order for the applicant's request to be granted. In failing to put on this evidence, says the Reorganized Debtor, the applicant failed to make its case for allowance of an administrative expense, and the request should thus be disallowed.

The authorities discussed in this opinion in fact support the argument made here by the Reorganized Debtor. After all, if the premium is adjusted for changes in the debtor's risk profile, that suggests that the value of the insurance to the estate depends

---

[7] This was argument of counsel. It was not supported by evidence.

on what the risk profile was in the post-petition period. The methodology employed by the Insurers in calculating the premium spread changes in the profile across the term of the contract, in effect averaging those costs over the life of the contract. There was nothing wrong with that methodology as a matter of business practice. However, there was something wrong with it as a matter of bankruptcy practice.

That is not the end of the matter, however. Most courts indulge a presumption in favor of the contract rate as reflective of the value of the benefit conferred, in the absence of rebuttal evidence to the contrary. *See In re Sportsman's Warehouse, Inc.*, 436 Bl.R. 308, 315 (Bankr. D.Del. 2009); *accord In re Imperial Beverage Group, LLC*, 457 B.R. 490, 502 (Bankr. N.D.Tex. 2011). Here, the Insurers presented evidence of the contract rate. That rate presumptively equalled the benefit realized by the estate. Like all presumptions, it was rebuttable by contrary evidence, a burden placed on the party objecting to the allowance of the claim. *Sportsman's Warehouse, supra; Imperial Beverage, supra*. The debtor failed to sustain that burden in this case.

Thus, while the Reorganized Debtor was right on the law, the Insurers enjoyed the benefit of the presumption, and that presumption was not rebutted. Thus, the claim for allowance of an administrative expense in the amount of $184,515.00 for 117 days of insurance coverage post-petition, an amount representing the *per diem* contract rate, must be granted.

A separate order will be entered consistent with this opinion.

# # #